IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Steven Laroy Pittman )
                                            )     Civil Action No. 6:11-852-MBS-KFM
                       Plaintiff,           )
                                            )     **REPORT OF MAGISTRATE JUDGE**
        vs.                                 )
                                            )
Michael J. Astrue,                          )
Commissioner of Social Security,            )
                                            )
                       Defendant.           )
_____ )

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits on September 7, 2007, alleging that he became unable to work on April 1, 2006, at which time he was 42 years old. The application was denied initially and on reconsideration by the Social Security Administration. On April 22, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and William E. Villa, an impartial vocational expert, appeared, considered the case *de novo*, and on January 7, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as

_____

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate.

amended. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on February 22, 2011. The plaintiff, proceeding *pro se*, then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2009.
>
> 2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 1, 2006, through his date last insured of June 30, 2009 (20 C.F.R. § 404.1571 *et seq.*).
>
> 3. Through the date last insured, the claimant has the following severe impairments: post-traumatic stress disorder ("PTSD"); mood disorder NOS; mild degenerative joint disease of the right knee; mild degenerative disc disease of the lumbar spine; mild osteoarthritis of the right hip; obesity (20 C.F.R. § 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) except the claimant is able to lift only 10 pounds frequently and also has the following nonexertional limitations: climb only frequently; occasionally stoop, crouch, kneel and crawl; limited to occupations involving routine tasks with 3-4 step instructions; brief, superficial contact with the public.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on March 18, 1967, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. § 404.1568).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, from April 1, 2006, through June 30, 2009, the date last insured (20 C.F.R. § 404.1520(g)).

The only issue before the Court is whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial

evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Medical Evidence Prior To The Relevant Time Period*

The plaintiff underwent a compensation and pension examination at the Veteran's Administration clinic in Minneapolis, Minnesota ("Minneapolis VAMC") on October 27, 2004, to assess whether his 50% service-connected disability should be increased. The plaintiff had received his rating in 1999 for depression with psychotic features, but was not under the care of a psychiatrist and was not taking psychotropic medication. The plaintiff reported he sometimes drank heavily. He was using Hydrocodone for back pain. The plaintiff was diagnosed with mood disorder, PTSD, and alcohol abuse. It was noted that

the plaintiff was limited to performing sedentary work because of his back condition (Tr. 275-83).

The plaintiff underwent a psychological consultative examination on June 22, 2005, in connection with a prior application for benefits. Donald E. Wiger, Ph.D., assessed dysthymia and paranoid personality disorder. He thought the plaintiff was able to understand directions, carry out mental tasks with reasonable persistence and pace, and work in an entry level job, but would have difficulty handling the stressors of the work place and should not deal much with the public (Tr. 266-67).

***Medical Evidence During The Relevant Period of April 1, 2006, to June 30, 2009.***

In September 2006, the plaintiff received treatment at the Minneapolis VAMC for an upper respiratory infection (Tr. 316). The plaintiff presented to Minneapolis VAMC on October 2, 2006, complaining that he had strained his knee a few days previously. He reported he was otherwise doing well (Tr. 409-10).

On December 15, 2006, the plaintiff consulted with Thomas C. Kundla, a social worker at Minneapolis VAMC, because he was experiencing problems sleeping. Mr. Kundla noted that the plaintiff was receiving 100% service-connected disability for a mood disorder. The plaintiff also had 10% ratings for a hiatal hernia and eczema. The plaintiff said he was seeing a doctor for anger management. The plaintiff described hearing muffled sounds or noises that were like a nightmare and then waking up. He also discussed financial, relational, and legal stressors. The plaintiff asked for medication to sleep better. Mr. Kundla noted the plaintiff's diagnosis was history of polysubstance abuse and insomnia and referred the plaintiff to a physician for his insomnia (Tr. 304).

That same day, psychologist Gregory Thelen, M.D. found the plaintiff was cooperative and fully oriented and had good eye contact, full and appropriate affect, no abnormal thought processes, and good insight. Dr. Thelen prescribed Trazadone for sleep (Tr. 302-03). The plaintiff presented to therapist Steven J. Nelson on January 23, 2007,

seeking an alcohol and drug evaluation pursuant to a court order after he had been arrested for disorderly conduct. The plaintiff did not think that he had a problem with drinking because he usually drank only moderate amounts over the weekend. On March 1, 2007, Scott McNairy, another VA psychiatrist, noted that the plaintiff's liver enzymes were strongly suggestive of hazardous use of alcohol (Tr. 294, 295-99).

On June 4, 2007, nurse practitioner Ruth A. Schrick performed a substance use assessment of the plaintiff. Ms. Schrick noted that the plaintiff had an altercation with his girlfriend in June 2006, which resulted in him being on probation through October 2007. The plaintiff also had to attend anger management classes from November 2006 to March 2007. The plaintiff presented as fully oriented with normal speech and euthymic mood. He denied any memory problems or abnormalities with thought content (Tr. 290-91).

Treatment notes from nurse practitioner Chris Stenseth, CNP, of the Minneapolis VAMC, dated October 2, 2007, state the plaintiff reported he had been doing well, although he was taking his medication only about 40% of the time. The plaintiff said he had strained his right knee a few days previously but denied any other symptoms. On examination, the plaintiff's right knee was swollen, but he had no other abnormalities. Mr. Stenseth assessed gastroesophageal reflux under good control, occasional constipation, knee strain, and high lipids (Tr. 311-12).

On November 21, 2007, Alford Karayusuf, M.D., performed a psychiatric consultative examination of the plaintiff in connection with his application for benefits. The plaintiff said he had been depressed since 1994 and that he had a hard time keeping a job. Initially, he denied any history of drug and alcohol abuse, but later in the interview, the plaintiff acknowledged that he drank excessively at one time. The plaintiff also reported he had been diagnosed with PTSD related to exposure to chemical warfare during the 1991 Gulf War (Tr. 326). The plaintiff indicated that he had been hospitalized in the naval psychiatric facility for depression and suicidal thoughts and that he had been involved in

7

outpatient psychiatric treatment at the Minneapolis VAMC since 1998. He had recently stopped his psychotherapy and only occasionally took his medications. The plaintiff reported a history of abuse as a child at the hands of his father. He complained of difficulty sleeping, flashbacks about his military service, a diminished appetite, and low self esteem, but he denied impaired concentration or memory. The plaintiff admitted that he drank every day from 1987 to 1994, but would not answer how much he drank every day. He noted that he lived with his girlfriend and their children. The plaintiff said he did not do any cooking, housework, or grocery shopping and did not have any hobbies or friends (Tr. 327).

On examination, the plaintiff was fully oriented and knew the names of four out of the last five presidents, but he displayed impaired recent recall (Tr. 327). The plaintiff described being very mistrustful and suspicious of others' motivations. Dr. Karayusuf estimated that the plaintiff's intelligence was in the low average range and that his insight was "nil." The plaintiff related in a cordial, polite, and slightly subdued manner. The plaintiff was cooperative in answering questions, but many of his responses were very vague, and he often said he did not remember in response to questions that were quite simple and straightforward. The plaintiff did not appear to be tense or anxious, and he showed no psychomotor agitation. His mood was mildly depressed, and he had a flat affect. Dr. Karayusuf assessed mood disorder, alcohol dependence in remission, and elements of PTSD. He concluded the plaintiff could understand, retain, and follow simple instructions; interact appropriately with fellow workers, supervisors, and the public; and maintain pace and persistence (Tr. 328).

When the plaintiff returned to the Minneapolis VAMC on December 4, 2007, to review his lab results, he reported he had been compliant with his medications, and he was smoking less. The plaintiff stated that his gastroesophageal reflux symptoms had improved. He was encouraged to continue making good dietary choices and to continue medication compliance and decrease his smoking (Tr. 380).

8

On December 5, 2007, Dan Larson, M.D., a state agency psychiatrist, reviewed all the evidence, including Dr. Karayusuf's report, and completed a psychiatric review technique form. Dr. Larson found that the plaintiff's mental impairments imposed "moderate" limitations in activities of daily living; difficulties in social functioning and maintaining concentration, persistence, or pace; and one or two episodes of decompensation, and that his impairments did not satisfy the requirements of a Listing so as to be *per se* disabling (Tr. 345-46). Dr. Larson also assessed the plaintiff's mental residual functional capacity ("RFC"). He concluded that the plaintiff was "moderately limited" in his ability to handle detailed instructions, maintain concentration for extended periods, work in coordination with others, and interact with the public. Dr. Larson found that the plaintiff was "not significantly limited" in the remaining 14 of 20 areas of work-related mental functioning, and was capable of the following: concentrating on, understanding, carrying out, and remembering routine, repetitive three to four step and limited-detailed instructions; having brief and superficial contact with co-workers; having brief, infrequent, and superficial contact with the public; coping with reasonably supportive supervisory styles; and tolerating the routine stresses of a routine, repetitive, three to four step or limited-detail work setting (Tr. 350-51).

On that same date, Charles T. Grant, M.D., a state agency physician, reviewed the plaintiff's medical record and concluded that he did not have any severe physical impairments (Tr. 332-34).

The plaintiff followed up on his hypertension at the Minneapolis VAMC on April 1, 2008. The plaintiff had not been compliant with his medications, and he still smoked every day. The plaintiff stated he felt well and denied any symptoms. He also indicated that his gastroesophageal symptoms were completely relieved with medications and diet modification. The plaintiff was advised of the consequences of continued non-compliance with his medications (Tr. 374-76).

On April 11, 2008, R. Owen Nelsen, Ph.D., a state agency psychologist reviewed the plaintiff's record and concurred with Dr. Larson's December 2007 assessment of the plaintiff's mental impairments (Tr. 423-25). The next day, Gregory Salmi, M.D., a state agency physician, affirmed Dr. Grant's December 2007 assessment that the plaintiff did not have a severe physical impairment (Tr. 426-28).

The plaintiff received treatment at the Minneapolis VAMC on April 24, 2008, for acute bacterial prostatitis (Tr. 461).

On April 30, 2008, John O'Neil, Ph.D., performed a new compensation and pension examination to assess the plaintiff's mental problems. The plaintiff reported having problems with angry outbursts for no apparent reason (Tr. 453). He described being disappointed and bored due to not working, but he denied experiencing significant depression. He said his relationship with his girlfriend had been "rocky" and that he did not have any close friends, but he indicated that he had positive relationships with his children. The plaintiff denied suicidal ideation, significant fears or worries, alcohol use, and homicidal thoughts. The plaintiff's thought and speech processes were occasionally rather tangential and rambling but generally coherent and logical. The plaintiff displayed unremarkable psychomotor activity and speech, and he was cooperative and relaxed and had an appropriate affect. He was fully oriented and displayed average intelligence and good judgment and insight (Tr. 454, 455).

Dr. O'Neil noted that the plaintiff reported he was fired from his last job doing general labor in 2005 because he had a conflict with the supervisor. The plaintiff stated that he had difficulty finding a job and that he looked for work "from time to time." Dr. O'Neil assessed mood disorder with psychotic features and alcohol abuse in sustained full remission. Dr. O'Neil noted that the plaintiff's level of functioning appeared to have improved somewhat since his last compensation and pension examination in October 2004, in that he did not exhibit overt symptoms of thought disorder such as delusional beliefs or

10

pressured speech. The plaintiff also did not relate symptoms of PTSD. Dr. O'Neil did not think the plaintiff had total occupational and social impairment due to his mental impairment (Tr. 457-58).

In June 2008, the VA assigned the plaintiff a 100% service-connected rating for mood disorder with psychotic features (Tr. 475).

Clinic notes from Mr. Stenseth dated July 11, 2008, state the plaintiff presented to have disability forms completed. Mr. Stenseth noted the plaintiff was recently seen for a compensation and pension examination and was thought to be able to work adequately on mental health grounds, although he had some problems in the past getting along with others. Mr. Stenseth indicated the plaintiff had mild degenerative joint disease and mild low back pain and that neither of these were "debilitating in any way." Mr. Stenseth stated the plaintiff physically "does not have grounds for disability" (Tr. 548-49). Mr. Stenseth, completed a medical assessment of the plaintiff's ability to do physical activities, indicating that the plaintiff could stand/walk and sit for eight hours at a time and for eight hours in an eight-hour workday; carry 50 pounds occasionally and 10 pounds frequently; occasionally stoop, crouch, kneel, and crawl; frequently climb; and constantly balance, reach, handle, feel, push, pull, see, hear, and speak; and had no environmental restrictions. Mr. Stenseth observed that the plaintiff had difficulty getting along with others in a work setting and that he had a history of excessive alcohol abuse (Tr. 481-84).

In August 2008, the plaintiff complained of muffled hearing and ringing in his ears. He had a large amount of cerumen in his left ear and was referred to audiology for removal (Tr. 546-48).

Treatment notes from Mr. Stenseth dated October 16, 2008, state the plaintiff complained of back and right knee pain. The plaintiff was still smoking, and he complained of occasional pulmonary wheezing and mild dyspnea. Mr. Stenseth assessed mild lumbar degenerative disc disease or lumbar strain and prescribed pain medications and physical

therapy. He noted the plaintiff had intact range of knee motion, no laxity, and no crepitus. Mr. Stenseth also assessed wheezing and advised the plaintiff to stop smoking (Tr. 543-44).

On November 7, 2008, the plaintiff consulted with Thomas Nelson, M.D., for evaluation of his right knee pain. The plaintiff complained of right knee pain for many years and said that an x-ray performed in 2000 showed some mild degenerative changes. He said his pain had gradually progressed, and he was having difficulty flexing his knee. On examination, the plaintiff walked with an antalgic gait, favoring the right leg. He had no effusion and had full extension. He had some mild crepitus with active range of motion. X-rays showed degenerative changes involving the medial and patellofemoral compartments. Dr. Nelson assessed osteoarthritis of the right knee. He saw little reason to do a cortisone injection because there was no effusion. He recommended quadriceps exercises and referred him for a hip x-ray on the slight chance that he had some degenerative changes in the right hip causing referred pain to the right knee (Tr. 542).

The plaintiff underwent physical therapy from December 2, 2008, to January 13, 2009. At the plaintiff's last physical therapy visit, it was noted that the plaintiff's pain was only intermittent and he had met all of his goals (Tr. 485-504).

The plaintiff presented to Aditya Maheshwari, M.D., on May 11, 2009, for evaluation of pain in his right hip, back, right knee, and right hand, which he said had been present for the previous 10 to 12 years. The plaintiff denied depression. On examination, the plaintiff walked with an antalgic gait, and he had trouble standing on the right side. He had scars on the upper portion of his back from previous wounds. The plaintiff had tenderness, but no motor or sensory deficits. The plaintiff had painful and restricted range of hip motion. There was mild creptitus with active range of knee motion, but no effusion, and he had full extension and flexion, no lateral joint line pain, and stable ligaments. He displayed a weak grip in his right hand. X-rays showed moderate bilateral degenerative

joint disease of the hips. Dr. Maheshwari assessed degenerative joint disease and prescribed a pain medication (Tr. 539-41).

Treatment notes from Mr. Stenseth dated June 2, 2009, state the plaintiff's blood pressure was high, he had stopped taking his statin medication, and he was still smoking. The plaintiff did not have any depression, and he denied using excessive alcohol. The plaintiff said his pain was "ok" on medications. He said he felt well. The plaintiff had a corticosteroid injection in his hip on June 3, 2009 (Tr. 533, 536-37).

**Medical Evidence Dated After June 30, 2009**

On July 15, 2009, the plaintiff reported that injections had alleviated his pain by about 30 to 40%. He was advised to modify his activity, lose weight, and use non-steroidal anti-inflammatory medications (Tr. 528).

In September 2009, the plaintiff received treatment for an upper respiratory infection, and he was again advised to stop smoking (Tr. 522).

**Administrative Hearing Testimony**

At the October 30, 2009, hearing, the plaintiff testified that he had been receiving a VA disability pension since 1999 or 2000, but he had a representative payee who handled his money. He stated that he smoked only about a pack of cigarettes a week and that he did not regularly drink alcohol. The plaintiff reported he could walk for only a couple of blocks at a time because of hip and knee pain. He said he used a cane sometimes, at times when he was more active. The plaintiff testified that he engaged in activities with his children such as shooting basketball or pushing them in the swing. The plaintiff reported he lived with his blind aunt, and she did the grocery shopping and his laundry. He stated that he underwent physical therapy over the summer, but he sometimes thought it made his back pain a little worse (Tr. 34, 37-41). He thought he could have used more therapy and that he was close to needing another round. The plaintiff testified that he did not take any psychiatric medications. He reported that he took anti-inflammatory

medication and that he did not have as much pain if he kept the swelling down. The plaintiff said that after the altercation with his girlfriend in 2006 he attended anger management classes. He stated that he did not interact much with other people because of his anger problems (Tr. 42, 47, 51-52).

Vocational expert William Villa, also testified at the October 2009 hearing. The ALJ asked Mr. Villa to assume a hypothetical individual of the plaintiff's age, education, and work experience, who could perform routine, repetitive three-to four-step tasks and instructions with brief, infrequent, superficial contacts with others; lift and carry 50 pounds occasionally and 10 pounds frequently; occasionally stoop, crouch, kneel, and crawl; and constantly balance. Mr. Villa testified that such an individual could perform the representative unskilled light jobs of food packager, inspector, and assembler (Tr. 62-63).

## ANALYSIS

Local Civil Rule 83.VII.04 DSC provides that "[a]fter the filing of an answer, the petitioner may file a written brief . . . within thirty (30) days." Thereafter, the Commissioner is allowed 40 days after the service of the petitioner's brief to file a responsive brief. Local Civil Rule 83.VII.05 DSC. When the *pro se* plaintiff in this case did not timely file a brief, this court gave him two extensions of time. The plaintiff did not file a brief, and the Clerk of Court has received no correspondence from him. The Commissioner filed a brief in support of the ALJ's decision on March 29, 2012.

Substantial evidence supports the ALJ's conclusion that the plaintiff was not disabled. In his January 7, 2010, decision, the ALJ found at the first step of the sequential evaluation process that the plaintiff had not engaged in any substantial gainful activity between April 1, 2006, his alleged onset of disability date, and June 30, 2009, the date he was last insured (Tr. 12). At the second step of the evaluation process, the ALJ determined that the plaintiff's PTSD, mood disorder, mild degenerative disc disease of the right knee, mild degenerative disc disease of the lumbar spine, mild osteoarthritis of the right hip, and

14

obesity were severe impairments (Tr. 12). At the third step of the evaluation process, the ALJ found that the plaintiff's impairments did not meet or medically equal the criteria of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Tr. 13-14). The ALJ also found that the plaintiff's allegations regarding his limitations were not totally credible (Tr. 15). The ALJ next determined that from April 1, 2006, to June 30, 2009, the plaintiff retained the RFC to perform routine, repetitive three to four-step tasks and instructions with brief, infrequent, superficial contacts with others; lift and carry 50 pounds occasionally and 10 pounds frequently; occasionally stoop, crouch, kneel, and crawl; and constantly balance (Tr. 14). The ALJ found the plaintiff's limitations through the date he was last insured would preclude his past relevant work, but that he could perform the unskilled light jobs of food packager, inspector, and assembler. Accordingly, the ALJ concluded that plaintiff was not disabled under the Act through June 30, 2009, the date he was last insured (Tr. 16-17).

Substantial evidence supported the ALJ's conclusion that the plaintiff's impairments did not result in disabling functional limitations for at least 12 consecutive months during the relevant time period, that he retained the RFC to perform a wide range of work, and that he could perform a significant number of jobs in the national economy. The medical evidence did not show that the plaintiff's PTSD, mood disorder, mild degenerative disc disease of the right knee, mild degenerative disc disease of the lumbar spine, mild osteoarthritis of the right hip, and obesity gave rise to disabling functional limitations. The evidence also did not show that the plaintiff was precluded from performing medium work that did not require more than frequent climbing and occasional stooping, crouching, kneeling, and crawling, and involved only routine tasks with three to four step instructions and brief, superficial contact with the public (Tr. 14). *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (lack of objective findings supported the ALJ's decision).

With respect to the plaintiff's mental impairments, the record shows that despite being diagnosed with PTSD and mood disorder, he did not seek or receive

15

significant treatment for these conditions, which led the ALJ to conclude that his psychiatric problems did not impose disabling limitations (Tr. 15). *See, e.g.,* Tr. 276 (October 2004 compensation and pension examination report states the plaintiff had received a 50% disability rating from the VA in 1999 for PTSD, but was not under psychiatric care and took no psychotropic medications); Tr. 264 (the plaintiff reported to Dr. Wiger in June 2005 that he had not received counseling for at least two years); Tr. 304 (the plaintiff sought medications to help him sleep in December 2006, discussing financial, relational, and legal stressors); Tr. 290 (the plaintiff attended anger management classes pursuant to the conditions of probation from November 2006 to March 2007); Tr. 327 (November 2007 examination report states the plaintiff stopped going to psychotherapy and did not take medications for his mental problems).

The relatively normal objective findings from the plaintiff's mental status examinations provided further substantial evidence supporting the ALJ's conclusion that the plaintiff was not disabled. For instance, on December 15, 2006, Dr. Thelen found that the plaintiff was cooperative and fully oriented and had good eye contact, full and appropriate affect, no abnormal thought processes, and good insight (Tr. 302). During the June 2007 substance abuse assessment, the plaintiff was fully oriented with normal speech and euthymic mood, and he denied any memory problems or abnormalities with thought content (Tr. 291). On April 1, 2008, the plaintiff reported to his provider at the Minneapolis VAMC that he felt well, and he denied any symptoms (Tr. 375). Dr. O'Neil found during his April 30, 2008, examination that the plaintiff was coherent, logical, and fully oriented. He also displayed unremarkable psychomotor activity and speech, was cooperative and relaxed, had an appropriate affect, and displayed average intelligence and good judgment and insight (Tr. 454-55). Dr. O'Neil thought that the plaintiff's mental problems had improved since his last compensation and pension examination (Tr. 457). Importantly, the plaintiff's treating medical sources at the VA did not think that his mental problems resulted in

16

disabling limitations. Although the plaintiff received a 100% service-connected disability rating from the VA (Tr. 475), VA psychologist Dr. O'Neil opined that the plaintiff did not have total occupational and social impairment from his mental problems (Tr. 458). Likewise, VA nurse practitioner Mr. Stenseth observed in July 2008 that the plaintiff did not seem to have mental health grounds for disability, although he had experienced some difficulty getting along with others at work in the past (Tr. 549). Like Mr. Stenseth, the ALJ acknowledged the evidence of the plaintiff's anger problems and of getting along with others, and reasonably limited him to having only brief superficial contact with the public (Tr. 15).

Dr. Karayusuf's November 2007 opinion provided further support for the ALJ's conclusion that the plaintiff could perform work involving routine tasks with three to four step instructions and brief, superficial contact with the public. After a thorough examination that yielded few objective findings, he concluded the plaintiff could understand, retain, and follow simple instructions; interact appropriately with fellow workers, supervisors, and the public; and maintain pace and persistence (Tr. 328). Further, the opinions of the two state agency physicians, Drs. Larson and Nelson, also supported the ALJ's RFC finding. Both doctors concluded the plaintiff could concentrate on, understand, carry out, and remember routine, repetitive three to four step and limited detailed instructions and have only superficial contact with the public (Tr. 351, 425).

Furthermore, as argued by the Commissioner, it is well-held that the VA definition of disability is not the same as that of the Social Security Administration and is not binding on the agency. *See* 20 C.F.R. § 404.1504; *Lee v. Sullivan*, 945 F.2d 687, 693 (4th Cir. 1991); *Curtis v. Astrue*, No. 08-1532, 2009 WL 2067904 , at *(8th Cir. July 17, 2009) (unpublished) (VA disability rating not binding on ALJ when evaluating whether claimant was disabled for purposes of disability insurance benefits); *Nelson v. Astrue*, CA. No. 0:07-3114, 2009 WL 742724, at *6 n.3 (D.S.C. Mar. 19, 2009) (unpublished) (an award of

benefits from the VA is not binding on the Commissioner in determining whether a claimant can engage in substantial gainful activity).

With regard to the plaintiff's physical impairments, the ALJ's conclusion that the plaintiff could perform medium work that did not require more than frequent climbing and occasional stooping, crouching, kneeling, and crawling is also supported by substantial evidence. The only medical source to place any limitations on the plaintiff's ability to work during the relevant time period was treating nurse practitioner Stenseth, who completed forms in July 2008 stating that as a result of his mild degenerative joint disease and mild low back pain, the plaintiff was limited to carrying 50 pounds occasionally and 10 pounds frequently; occasionally stooping, crouching, kneeling, and crawling; and frequently climbing (Tr. 481-83).

Although the plaintiff's complaints of musculoskeletal pain increased after October 2008, the treatment notes did not support an increase in the limitations assigned by Mr. Stenseth. In November 2008, Dr. Nelson recommended only very conservative treatment consisting of quadriceps exercises (Tr. 542). After undergoing physical therapy for a month, the plaintiff was discharged after he met all his goals, and his pain was only intermittent (Tr. 486). The plaintiff did not see another physician for his musculoskeletal complaints for several months (Tr. 539).

When the plaintiff presented to Dr. Maheshwari on May 11, 2009, he asserted that his back, hip, knee, and right-hand pain had been bothering him for 10 to 12 years (Tr. 539). However, the plaintiff's medical record shows the plaintiff had very few complaints of physical problems until October 2008. *See, e.g.,* Tr. 311-12 (October 2007 treatment notes showed the plaintiff was not compliant with his medications and he had strained his right knee a few days previously, but he reported he was doing well); Tr. 380 (VA treatment notes dated December 4, 2007, show the plaintiff's reflux symptoms had improved, and he was compliant with his medications; he did not mention any musculoskeletal pain).

18

At that visit in May 2009, Dr. Maheshwari prescribed pain medications for the plaintiff (Tr. 541), and a month later, the plaintiff told Mr. Stenseth that his pain was "ok" with medications and that he felt well (Tr. 536-37). After the plaintiff has a corticosteroid injection in his hip on June 3, 2009, he reported a month later that his pain had improved 30 to 40% (Tr. 528, 533). At this July 15, 2009 appointment, the plaintiff was advised to lose weight and use nonsteroidal anti-inflammatory medications, but no further treatment was recommended (Tr. 528).

Based upon the foregoing, the record evidence supports the ALJ's conclusion that the plaintiff had the RFC to perform medium work that did not require more than frequent climbing and occasional stooping, crouching, kneeling, and crawling, and involving routine tasks with three to four step instructions and brief, superficial contact with the public.

The ALJ acknowledged the plaintiff's subjective complaints, including his statements that he experienced disabling mental symptoms, but found that the plaintiff's subjective complaints were not fully credible (Tr. 15, 21-22). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.

20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ acknowledged that the plaintiff had impairments capable of producing his subjective symptoms. As the ALJ found, however, the plaintiff's subjective

testimony regarding the severity of his symptoms was not fully credible (Tr. 15). The objective medical findings of the VA medical providers and Drs. Wiger and Karayusuf, as well as the conclusions of the State agency physicians, did not indicate the degree of symptomology and physical limitation that the plaintiff alleged. The ALJ also noted that the plaintiff did not seek much treatment for his psychiatric problems, which reflects poorly on the credibility of his claims. Given the plaintiff's history of anger difficulties, the ALJ appropriately limited the plaintiff to only brief, superficial contact with the public. The ALJ noted that the plaintiff did not indicate any disagreement with the opinion of his treating nurse practitioner, Chris Stenseth, that he could lift no more than 10 pounds frequently and up to 50 pounds occasionally with no limits on standing or sitting in an 8 hour day. The ALJ gave that opinion great weight. In evaluating the plaintiff's credibility, the ALJ also noted that the plaintiff had little motivation to work or seek treatment because of his receipt of VA benefits (Tr. 15). Based upon the foregoing, the ALJ conducted a proper credibility analysis supported by substantial evidence.

The ALJ found that the plaintiff could not return to his past relevant work as a warehouse worker (Tr. 16). In response to a hypothetical question that contained all the limitations the ALJ found credible, the vocational expert testified that the plaintiff could perform the jobs of food packager, inspector, and assembler (Tr. 63). The ALJ properly relied upon the vocational expert's testimony to determine that there were other jobs that the plaintiff could perform and, therefore, that he was not disabled prior to the date his insured status expired. *See Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989) (a vocational expert's testimony in response to a hypothetical question that accurately describes all of the claimant's limitations may be relied upon to show the existence of jobs that a claimant can perform).

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

<div style="margin-left: 50%;">

s/ Kevin F. McDonald
United States Magistrate Judge

</div>

May 10, 2012
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
300 East Washington St, Room 239
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984.